IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AARON R. SEALS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 C 3296 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | Magistrate Judge Susan E. Cox |
| Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Aaron R. Seals ("Plaintiff") appeals the Commissioner of Social Security's decision to deny him Social Security disability benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Social Security Act. We deny Plaintiff's motion for summary judgment [dkt. 16] and grant the Commissioner's motion for summary judgment [dkt. 24]. The Administrative Law Judge's decision is affirmed.

## STATEMENT

Plaintiff appeals the Commissioner of Social Security's decision to deny him Social Security disability benefits under Title II of the Social Security Act ("SSA") and Supplemental Security Income ("SSI") under Title XVI of the SSA. Plaintiff filed a motion for summary judgment [dkt. 16] seeking reversal of the decision of the Administrative Law Judge ("ALJ"). A motion for summary judgment has been filed on behalf of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"). For the reasons outlined below, we deny Plaintiff's motion and grant the Commissioner's motion [dkt. 24]. The ALJ's decision is affirmed.

Plaintiff claims that he has been disabled since October 2, 2008, due to a seizure disorder,

depression, and high blood pressure.[1] Plaintiff applied for disability benefits on September 12, 2011.[2] His application was denied by the Social Security Administration; and denied again upon reconsideration.[3] He filed a request for a hearing before an ALJ, and that hearing took place on April 29, 2013, in front of ALJ Rebecca LaRiccia.[4]

From August 2006 to October 2008, Plaintiff worked as a security guard at a clothing store.[5] At his hearing, Plaintiff testified that he had three seizures within his first six months of working as a security guard.[6] In October 2008, Plaintiff got in an argument with his supervisor when he asked Plaintiff to reduce his hours from 40 hours a week to 20.[7] Following this argument, Plaintiff quit his job.[8] Plaintiff continues to look for work as a stock room or warehouse employee.[9]

Plaintiff's reports regarding the frequency of his seizures often varied. In 2007, Plaintiff presented to John H. Stroger Hospital where he reported that he suffered from a complex partial seizure disorder.[10] Plaintiff reported that his last seizure was two weeks prior to his visit, but that he normally had two seizures per week.[11] His seizures are characterized by a staring spell that lasts for 2-3 minutes, followed by a period of confusion and disorientation.[12] Plaintiff returned to Stroger Hospital five months later, in April 2008, with symptoms that were "no worse, no better."[13]

---

[1] R. at 18-19.
[2] R. at 16.
[3] *Id*.
[4] *Id.*
[5] R. at 148-49.
[6] R. at 726-28.
[7] R. at 725.
[8] *Id*.
[9] *Id.*
[10] R. at 473-74.
[11] *Id*.
[12] *Id.*
[13] R. at 474.

In December 2008, Plaintiff reported having 2-3 seizures per month during a consultative exam with Disability Determination Services ("DDS") physician Dilap Patel, M.D.[14] Dr. Patel noted that Plaintiff was "alert, and oriented to time, place, and person," and that he was "competent to handle his own funds."[15] Plaintiff again reported to Stroger Hospital in May 2009, this time reporting 2-3 seizures per week.[16] Plaintiff met with Dr. Patel again in August 2009 where he reported having only one seizure per month.[17] In April 2010, Plaintiff called Stroger Hospital to report two seizures that he had while performing yard work.[18] Before the first seizure, Plaintiff felt nauseated and hungry and went to work in the yard where he entered a staring spell before falling to the ground.[19] Two days later, Plaintiff entered a staring spell while trimming the grass.[20] Plaintiff no longer does yard work.[21]

Plaintiff began seeing his treating physician, Nelda Scott Akinbile, M.D., in 2010.[22] Dr. Akinbile began working with Plaintiff to establish a medication regimen that would effectively manage his seizure disorder, his depression, and his conversion disorder.[23] Around this time, Plaintiff began complaining of auditory hallucinations; specifically, he reported that he had conversations with his deceased father.[24] Dr. Akinbile prescribed Risperidone for Plaintiff's auditory hallucinations, which proved effective.[25] Despite Plaintiff's complaints of hallucinations, his applications for SSI and Disability Benefits did not allege that his auditory

---

[14] R. at 428.
[15] R. at 429.
[16] R. at 447.
[17] R. at 454.
[18] R. at 484.
[19] *Id.*
[20] *Id.*
[21] R. at 737.
[22] R. at 572.
[23] R. at 21.
[24] R. at 495.
[25] R. at 741.

hallucinations prevented him from working.[26] Plaintiff's seizure medication appears to have been effective as well; at his hearing, he reported that he has fewer seizures when he takes his medication.[27]

Plaintiff has shown difficulties in keeping up with his medication requirements. The ALJ cited doctor notes referencing non-compliance in February 2009, May 2009, July 2009, August 2009, and October 2010.[28] Moreover, a blood test from July 2012 found that Plaintiff's blood-drug level was below the level it would have been if Plaintiff were following his treatment requirements.[29] This information is supported by Plaintiff's testimony at his hearing that he "didn't get [his prescription] filled on time" because of a "slip of mind."[30]

In addition to seizures, Plaintiff suffers from a conversion disorder, which means that his physical symptoms and behavioral changes are often preceded by stress.[31] Plaintiff supported this diagnosis at his hearing when he acknowledged that stress often causes his seizures.[32] Plaintiff, who lives at home with his mother and grandmother, testified that living at home with his family causes him stress.[33] Plaintiff also testified that he had fewer seizures when he was not living at home.[34] Plaintiff's current living situation also influences his depression. Plaintiff testified, "basically I have no means of income so I get depressed. All I can do is sit at the house all day with nothing to do and nowhere to go. So that just brings me down."[35]

In his Function Report, Plaintiff indicated that he feels more comfortable talking with

---

[26] R. at 33-34.
[27] R. at 730.
[28] R. at 22.
[29] *Id.*
[30] R. at 729.
[31] R. at 28.
[32] R. at 741.
[33] *Id.*
[34] R. at 742.
[35] R. at 733.

strangers than he does with his own family, that he can grocery shop, cook with occasional reminders from family members to turn off the oven, that he goes outside, and that he can count change.[36] Plaintiff also reported that he performs chores such as ironing, laundry, cleaning, and that he has no problem with personal care.[37] Plaintiff's brother and mother also filled out Function Reports, in which they indicated that he had no difficulties with personal care and that he used public transportation.[38] Plaintiff's mother also reported that he goes to church, plays cards, reads, and watches TV during the day.[39] Plaintiff also testified that he watches after his grandmother while his mother is at work.[40]

Dr. Laron Phillips, M.D., another DDS physician, performed a psychiatric evaluation in August 2010.[41] Dr. Phillips supported a diagnosis of depression, ruled out a diagnosis of psychotic disorder, and found that Plaintiff would have "at most, moderate impairment should he return to work."[42] Plaintiff saw two other DDS physicians, B. Johnson, Ph. D., in September 2010,[43] and Lionel Hudspeth, Psy. D., in December 2011.[44] Both DDS psychologists completed Mental Residual Functional Capacity ("MRFC") Assessments and reported that Plaintiff had mild limitations in restrictions on activities of daily living, and moderate limitations in maintaining social functioning and concentration, persistence, or pace.[45] Kirk Boyenga, Ph. D., confirmed these findings in June 2012 at the reconsideration level.[46]

In 2013, after Plaintiff's hearing, Plaintiff's treating physician, Dr. Akinbile, noted that

---

[36] R. at 185-90.
[37] *Id.*
[38] R. at 283, 283; 351, 353.
[39] R. at 282-84.
[40] R. at 732.
[41] R. at 502.
[42] R. at 504.
[43] R. at 524.
[44] R. at 609.
[45] R. at 520; R. at 619.
[46] R. at 647-50.

5

Plaintiff's memory, interpersonal skills and anxiety would make working challenging.[47] In a MRFC Assessment, Dr. Akinbile assessed marked limitations in activities of the daily living, maintaining concentration, persistence of pace, and in maintaining social functioning.[48] These limitations are greater than those reported by the three DDS physicians .

Following the hearing, the ALJ determined, *inter alia*, that: 1) Plaintiff had not engaged in substantial gainful activity since October 2, 2008; 2) Plaintiff had severe impairments in the form of complex partial seizure disorder, headaches, a conversion disorder and depression; 3) Plaintiff's impairments did not meet the severity of "the listings" in 20 CFR Part 404, Subpart P, Appendix 1; 4) Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations: no climbing ladders, ropes, and scaffolds, and no work hazards; 5) Plaintiff can understand, remember and carry out simple, routine and repetitive tasks with no direct contact with the general public and brief superficial contact with co-workers and supervisors; and 6) there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, given his age, education, work experience and residual functional capacity.[49]

## **DISCUSSION**

Plaintiff raises three main arguments as to why this Court should overturn the ALJ's decision: 1) the ALJ erred in concluding that Plaintiff did not meet the criteria of the Listings; 2) the ALJ erred in affording "little weight" to Plaintiff's treating physician; and 3) the ALJ failed to build a logical bridge between the evidence and her ultimate credibility determination.[50] We reject all three arguments for the reasons discussed more fully below.

---

[47] R. at 712.
[48] R. at 713-14.
[49] R. at 18-30.
[50] Pl.'s Mot. at 6-13.

**STANDARD OF REVIEW**

The ALJ's decision must be upheld if it follows the administrative procedure for determining whether the plaintiff is disabled as set forth in the Act,[51] if it is supported by substantial evidence, and if it is free of legal error.[52] Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion."[53] Although we review the ALJ's decision deferentially, she must nevertheless build a "logical bridge" between the evidence and her conclusion.[54] A "minimal[] articulat[ion] of her justification" is enough.[55]

**I.  THE ALJ PROPERLY ARRIVED AT AND EXPLAINED HER FINDING THAT PLAINTIFF DID NOT MEET THE REQUIREMENTS OF THE LISTED IMPAIRMENTS IN 20 CFR PART 404, SUBPART P, APPENDIX 1.**

   *A.  There is Substantial Evidence to Support the ALJ's Conclusion that Plaintiff Did not Meet the Requirements for Listing 11.03.*

Plaintiff argues that he meets the Listing 11.03 for non-convulsive epilepsy.[56] To qualify for Listing 11.03, the claimant must have seizures more frequently than once weekly, in spite of at least three months of prescribed treatment.[57] Plaintiff takes issue with the ALJ's reliance on six instances where a physician reported that Plaintiff had run out of, and consequently stopped taking, one or more of his prescribed medications.[58] Plaintiff contends that there were periods of time during which he was taking medication for three consecutive months.[59] To determine whether a claimant is complying with a prescribed treatment "[t]he ALJ must evaluate blood

---

[51] 20 C.F.R. §§ 404.1520(a) and 416.920(a) (2014).
[52] 42 U.S.C. § 405(g).
[53] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).
[54] *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).
[55] *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).
[56] Pl.'s Mot., 6.
[57] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03.
[58] Pl.'s Mot. at 6; R. at 22.
[59] Pl.'s Mot. at 6-7.

drug levels along with all other evidence to determine the extent of the claimant's compliance with treatment."[60]

The ALJ properly evaluated Plaintiff's blood drug levels and found that they were half of what they would have been had Plaintiff been taking his medication as prescribed.[61] Additionally, the ALJ cited six separate occasions where a physician noted that the Plaintiff had not been taking his medication, sometimes for as long as three months, because he had run out of one of his medications.[62] Plaintiff even testified to his difficulties in consistently taking his medication, stating, "I had more than likely ran out of medication and didn't get it filled on time."[63] Even if Plaintiff had completed three consecutive months of treatment, there is substantial evidence to support the ALJ's conclusion, discussed in more detail below, that Plaintiff was not having more than one seizure per week. Regardless, Plaintiff's testimony, coupled with the documented evidence of his non-compliance with his prescribed treatment plan, offers substantial evidence to support the ALJ's conclusion that Plaintiff did not meet the requirements for Listing 11.03.

   B. *There is Substantial Evidence to Support the ALJ's Determination that Plaintiff Did not Meet the Requirements for Listing 12.04.*

Plaintiff also contends that the ALJ failed to properly analyze whether Plaintiff's depression met the requirements of Listing 12.04 for affective disorders.[64] Listing 12.04 is met when a claimant suffering from an affective disorder, in this case depression, meets the severity level of enough of the listed "A criteria," which results in at least two of the following "B criteria": 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining

---

[60] *Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir. 2001) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00 (a).
[61] R. at 22.
[62] *Id.*
[63] R. at 729.
[64] Pl.'s Mot. at 7.

8

social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration.[65] Plaintiff specifically takes issue with the ALJ's treatment of the B criteria. "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing."[66] The ALJ in this case specifically discussed Listing 12.04 by name, and then analyzed its requirements at length before concluding that Plaintiff's limitations did not meet the Listing.[67]

Plaintiff reported that he was able to do chores, that he could prepare his own meals, and that he had no problems with personal care.[68] All of these activities support the ALJ's finding that Plaintiff had only mild restrictions in the activities of daily living.[69] While, "a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time,"[70] there is substantial evidence that Plaintiff can perform most daily activities with only mild limitations. In fact, Plaintiff, his mother, and his brother reported that he had no problem with personal care,[71] and the ALJ noted this in her decision.[72] Furthermore, like the ALJ, DDS physicians Dr. Hudspeth and Dr. Johnson assessed mild limitations in activities of daily living when they completed their own MRFC Assessments.[73]

---

[65] 20 C.F.R. Pt. 404, Subpt P., App. 1, 12.04(a)-(b).
[66] *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).
[67] R. at 22.
[68] R. at 185-90.
[69] R. at 22.
[70] *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (citing *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011)).
[71] R. at 338; R. at 230; R. at 351.
[72] R. at 29.
[73] R. at 520; R. at 619.

The ALJ relied on the Plaintiff's own testimony and reports to assess moderate limitations to Plaintiff's social functioning.[74] Citing *Ribaudo v. Barnhart*, Plaintiff alleges that the ALJ's examination of these criteria amount to a "perfunctory analysis."[75] The ALJ in *Ribaudo*, unlike the ALJ in the present case, failed to mention the listing by name and also failed to cite any facts favorable to the plaintiff.[76] In this case, the ALJ considered Plaintiff's disagreements with his previous boss and his family members, but ultimately found the fact that Plaintiff goes shopping, goes to church, goes outside daily, and uses public transportation to be a better reflection of Plaintiff's social functioning capabilities.[77] This evidence, in combination with the identical conclusions reached by Dr. Hudspeth and Dr. Johnson, amounts to substantial evidence supporting the ALJ's conclusion that Plaintiff has moderate difficulties in social functioning.

Finally, the ALJ assessed moderate limitations with concentration, persistence, or pace.[78] Again assessing evidence favorable to Plaintiff, the ALJ pointed out that "the consultative examiner noted short-term memory deficits . . . and significant problems with concentration."[79] Plaintiff argues that this should have led the ALJ to conclude that Plaintiff had marked limitations in concentration, persistence, or pace.[80] However, we defer to the ALJ's determination on this issue because, in addition to some evidence that supports a finding of marked limitation, there is substantial medical evidence that supports her finding of moderate

---

[74] R. at 22.
[75] Pl.'s Mot. at 8.
[76] *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).
[77] R. at 22.
[78] *Id.*
[79] *Id.*
[80] Pl.'s Mot. at 7.

10

limitations.[81] The ALJ did not ignore any significant line of evidence, and she offered a minimal articulation of her justification.

Even if the ALJ had found marked difficulties in concentration, persistence, or pace, Plaintiff's limitations would not have met the severity requirements of Listing 12.04, which requires marked limitations in at least two of the three "B criteria" or marked limitations in one of the B criteria, in addition to episodes of decompensation.[82] Because Plaintiff had only mild limitations in activities of daily living, moderate limitations in social functioning, and no episodes of decompensation, a finding of marked limitations in concentration, persistence, or pace would not have changed the ALJ's ultimate conclusion.

We cannot remand simply because Plaintiff disagrees with the ALJ's conclusions. The ALJ identified the relevant listed impairments, discussed a significant amount of evidence, and came to a conclusion devoid of any clear error. This portion of her decision is affirmed.

## II. THE ALJ'S DECISION TO ASCRIBE "LITTLE WEIGHT" TO PLAINTIFF'S TREATING PHYSICIAN'S OPINION IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

Next, Plaintiff claims that the ALJ erred in assigning little weight to his treating physician, Dr. Akinbile's, opinion.[83] Plaintiff contends that, to evaluate Dr. Akinbile's opinion regarding the severity of Plaintiff's impairments, the ALJ should have considered all of Plaintiff's Global Assessment Functioning ("GAF") scores.[84] While "an ALJ may not ignore an entire line of evidence that is contrary to her findings,"[85] the Seventh Circuit has held that "[a]n

---

[81] R. at 713; *See* R. at 520, R at. 619 (Dr. Hudspeth and Dr. Johnson both assessed moderate limitations in maintaining concentration, persistence, or pace).
[82] *See* 20 C.F.R. Pt. 404, Subpt P., App. 1, § 12.04(a)-(b);
[83] Pl.'s Mot. at 8.
[84] *Id.*
[85] *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999).

ALJ is not required to evaluate every piece of testimony and evidence."[86] Instead, she must articulate at some minimal level her analysis of the evidence to permit an informed review.[87] Furthermore, as Commissioner notes in her brief, the Seventh Circuit has also held that a claimant's low GAF scores are not, on their own, conclusive evidence of disability.[88]

When, as here, an ALJ does not give a treating physician's opinion controlling weight, she must consider five factors: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of the treatment relationship"; (3) "[s]upportability"; (4) consistency "with the record as a whole"; and (5) whether the treating physician was a specialist in the relevant area.[89] In this case, the ALJ cited the "infrequency [and] sporadic nature of treatment," the lack of supportability, the "inconsistency with other opinion evidence on file," and even the inconsistency between Dr. Akinbile's opinions and Plaintiff's own testimony.[90]

Additionally, the ALJ did, in fact, discuss Plaintiff's GAF scores when analyzing his severe impairments.[91] Although the ALJ declined to mention Plaintiff's GAF scores in assigning weight to Dr. Akinbile's medical opinions, she was not required to do so.[92] Instead, she complied with her requirements by engaging in an analysis of the factors required by 20 CFR § 404.1527.

---

[86] *Hall v. Astrue*, 218 F. App'x 499, 501 (7th Cir. 2007) (citing *Rice v. Barnhart,* 384 F.3d 363, 370 (7th Cir. 2004)).
[87] *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).
[88] *See* Def.'s Mot. at 10 (citing *Denton v. Astrue*, 596 F.3d 418, 425 (7th Cir. 2010)).
[89] 20 C.F.R. § 404.1527(c)(2)-(5).
[90] R. at 29.
[91] R at 20, 21.
[92] *See Hall*, 218 F. App'x at 501.

This analysis revealed that Dr. Akinbile's opinions regarding the degree of Plaintiff's disability were inconsistent with the record.[93] Plaintiff and his family reported that he did not have problems with personal care management, but Dr. Akinbile still found moderate difficulties in Plaintiff's abilities to "sustain an ordinary routine" and "perform activities within a schedule."[94] Moreover, Dr. Akinbile opined that Plaintiff was "incapable of dealing with others even on a superficial basis and incapable of maintaining any work activity."[95] However, as the ALJ pointed out, Plaintiff continued to look for work, lived and interacted with his family, interacted with others enough to utilize public transportation, attended church, went outside, and went shopping.[96]

Contrary to Dr. Akinbile's assessment, Plaintiff indicated that he feels more comfortable talking to strangers than to his own family.[97] Also, Plaintiff was able to maintain employment. He left his previous job on his own accord following a disagreement with management about a reduction of his hours.[98] These activities do not conclusively determine that Plaintiff is without limitations; however, they do support the ALJ's conclusion that Dr. Akinbile's opinion that Plaintiff is "incapable of dealing with others"[99] is not accurate. Reasonably, the ALJ considered Dr. Akinbile's opinions in establishing Plaintiff's Residual Functional Capacity, but decided to place more weight on the DDS physicians' opinions, for which the evidence provided greater support. We affirm the ALJ's decision to grant little weight to Dr. Akinbile's medical opinions because it is supported by substantial evidence.

---

[93] R. at 28.
[94] R. at 713.
[95] R. at 29.
[96] *Id.*
[97] R. at 185.
[98] R. at 725.
[99] R. at 29.

### III. THE ALJ BUILT A LOGICAL BRIDGE BETWEEN THE SUBJECTIVE EVIDENCE, THE OBJECTIVE MEDICAL EVIDENCE, AND HER ULTIMATE CREDIBILITY DETERMINATION.

Finally, Plaintiff argues that the ALJ only cited Plaintiff's ability to perform daily activities and failed to build a logical bridge between the evidence and her credibility finding. The Seventh Circuit has held that we may only overturn an ALJ's credibility determination if it is "patently wrong."[100] Furthermore, "[an] ALJ's credibility determination[] [is] entitled to special deference because the ALJ has the opportunity to observe the claimant testifying."[101] "Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading."[102]

Plaintiff asserts that the ALJ based her credibility determination only on Plaintiff's self-reports that he was able to complete daily activities;[103] however, in making her credibility determination, the ALJ in this case examined the objective medical evidence produced by Plaintiff's treating physician, DDS examiners, other physicians, Plaintiff's own testimony, and Function Reports completed by Plaintiff's family.[104] Plaintiff offered numerous inconsistent reports of how frequently he experienced seizures.[105] Plaintiff reported having seizures anywhere from two seizures a week,[106] to one a month,[107] to one every two months,[108] to one per

---

[100] *Jens v. Barnhart*, 347 F.3d 209, 214 (7th Cir. 2003) (citing *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000)).
[101] *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (citing *Castile v. Astrue*, 617 F.3d 923, 928–29 (7th Cir. 2010)).
[102] *Id.*
[103] Pl.'s Mot. at 14.
[104] R. at 23-29.
[105] R. at 25-26.
[106] R. at 25.
[107] R. at 26.
[108] R. at 726.

year.[109] These inconsistences support the ALJ's conclusion that Plaintiff's claim about the severity of his impairment was not entirely credible.

In addition to the inconsistency of Plaintiff's reported seizure frequency, the ALJ based her credibility determination on Plaintiff's non-compliance with his medication. An "individual's statements may be less credible . . . if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."[110] However, the ALJ cannot rely on non-compliance alone, "[t]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide . . . ."[111] Here, the ALJ reviewed reports from multiple physicians and asked Plaintiff at his hearing why he had not complied with his medications, to which Plaintiff replied he did not get them filled because it slips his mind.[112] Although Plaintiff's difficulties in memory may have contributed to his inability to follow the prescribed treatment plan, he did not raise this argument. In fact, his treating physician noted that "what [Plaintiff] calls memory problems are relatively minor and could be improved by record keeping."[113] Moreover, the ALJ did not rely solely on medication non-compliance in assessing Plaintiff's credibility; rather, she inquired into Plaintiff's non-compliance and used that information as a factor to inform her credibility determination.

Regarding Plaintiff's mental impairments, the ALJ again performed an extensive examination of the evidence in the record. The ALJ considered Plaintiff's difficulties with

---

[109] R. at 26.
[110] SSR 96-7P Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 FR 34483-01 (July 2, 1996).
[111] *Id.*
[112] R. at 729-30.
[113] R. at 577.

15

memory,[114] the fact that his stressors, which often lead to his physical symptoms and behavioral changes,[115] are financial and family based,[116] and the effectiveness of Risperidone at stopping Plaintiff's hallucinations.[117] The ALJ noted that Plaintiff would probably be better off if he was living on his own and working again instead of constantly being exposed to the stress that comes from living with his family.[118] The Plaintiff echoed this sentiment at his hearing when he testified, "the stress I have is basically living at home with my mother and also sometimes when I'm around my . . . oldest brother."[119] Regarding his depression, Plaintiff also testified, "basically I have no means of income so I get depressed. All I can do is sit at the house all day with nothing to do and nowhere to go. So that just brings me down."[120]

Taking all of this evidence into account, as well as the evidence of Plaintiff's ability to complete daily activities, the ALJ compensated for Plaintiff's limitations and found that he can "carry out simple, routine and repetitive tasks with no direct contact with the general public and brief superficial contact with co-workers and supervisors."[121] The ALJ built a logical bridge between the evidence in the record and her credibility finding, and her conclusion that Plaintiff's limitations are not disabling is supported by substantial evidence.

## **CONCLUSION**

For the foregoing reasons, we affirm the ALJ's decision. Plaintiff's motion for summary judgment is denied [dkt. 16] and the Commissioner's motion for summary judgment is hereby granted [dkt. 24].

---

[114] R. at 27.
[115] R. at 28.
[116] R. at 27.
[117] R. at 28.
[118] R. at 27.
[119] R. at 741.
[120] R. at 733.
[121] R. at 23.

16

**ENTER:**

**DATED:** August 6, 2015

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Susan E. Cox
United States Magistrate Judge